UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X

BARNABAS LOUIS,

                    Petitioner,

        -against-                          **REPORT AND
                                           RECOMMENDATION**
                                           04-CV-2887(NGG)(KAM)
BRIAN FISCHER, Warden,
Sing Sing Correctional Facility,

                    Respondent.
--------------------------------------- X

MATSUMOTO, United States Magistrate Judge:

        Pro se petitioner **Barnabas Louis**[1] ("Louis" or

"petitioner") seeks a writ of habeas corpus, pursuant to 28

U.S.C. § 2254, from his December 18, 2000 conviction in Supreme

Court, Kings County, for Manslaughter in the First Degree (N.Y.

Penal Law § 125.20(1)), arising out of an incident occurring

during the early morning hours of July 20, 1999, in which the

victim, Fritzner Pierre-Louis ("Pierre-Louis" or the "deceased"),

sustained multiple injuries to the head and died five days later.

Petitioner was sentenced to a term of imprisonment of fifteen

years and is currently incarcerated pursuant to that sentence.

By order dated May 16, 2006, this matter was referred by United

States District Judge Nicholas G. Garaufis, pursuant to 28 U.S.C.

§ 636(b)(1)(B), to the undersigned for a report and

recommendation on the instant petition. (See docket no. 6.) For

_____

        [1] The names of witnesses who testified at trial have been
marked in boldface and underlined in the first instance.

-1-

the following reasons, it is respectfully recommended that Louis's petition be denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

Petitioner's jury trial was held December 5-18, 2000 before Justice Matthew J. D'Emic in Supreme Court, Kings County. (<u>See</u> docket no. 4, State Court Record, Trial Transcript ("Tr.").) The Court here summarizes the relevant facts presented at the trial.

### A.    **The Prosecution's Case**

#### 1.    **The Incident**

In July 1999, Fritzner Pierre-Louis was living in apartment 1F of 212 East 34th Street, Brooklyn, New York, along with his siblings, **Marie Gay** and Patrick Gay. (Gay: Tr. at 252-53.) Their mother, Lucienne Jonathas, was visiting from Haiti and staying at the same apartment. (<u>Id.</u>) At approximately 10:30 p.m. on July 19, 1999, Marie Gay arrived home from classes at Medgar Evers College. (<u>Id.</u> at 227-29.) Lucienne Jonathas was the only person in the apartment when Marie Gay arrived. (<u>Id.</u> at 230.) Marie Gay sat down at the kitchen table and began doing her homework. (<u>Id.</u> at 231.) At approximately 11:30 p.m., **Frantz Eveillard** ("Eveillard"), Pierre-Louis's brother, came to visit his mother. (Eveillard: Tr. at 24, 27.) As Eveillard was

leaving to return home, he saw Pierre-Louis being dropped off by a friend. (Id. at 28.) After entering the apartment, Pierre-Louis went to his bedroom. Pierre-Louis later came back to the kitchen to get a drink and take the garbage outside. (Gay: Tr. at 231-32.)

Marie Gay and **Jean Hercules** ("Hercules") testified for the prosecution as eyewitnesses to the incident. Hercules testified that in July 1999, he lived at 189 East 34th Street, and that on the night of the incident he was sitting alone playing the flute on the steps of a friend's building, three houses down from 212 East 34th Street. (Hercules: Tr. at 308-11, 341-42, 354-55.)[2] Hercules saw Pierre-Louis and a woman sitting in a car in front of 212 East 34th Street. (Id. at 311-12.)

After five minutes, petitioner, while driving a Jeep, hit the side of the car in which Pierre-Louis and the woman were sitting. (Id. at 312.) The woman in the car with Pierre-Louis was petitioner's wife, Nadine Cenescat ("Cenescat"). (Louis: Tr. at 471, 474-75.) Both petitioner and Cenescat were wearing Domino's Pizza uniforms. (Gay: Tr. at 240.) Petitioner exited his vehicle and began kicking the car in which Pierre-Louis and

---

[2] During grand jury testimony, Hercules testified, through an interpreter, that he was sitting outside of his own house, which is located at 189 East 34th St. (Hercules: Tr. at 329.) At trial, he testified, also through an interpreter, that although he lived at 189 East 34th Street, he was sitting in front of his friend's building, which is three houses down from 212 East 34th Street. (Id. at 352-53.)

Cenescat were sitting. (Hercules: Tr. at 312-13.) Pierre-Louis got out of the car, followed by Cenescat. (Id. at 312.) Petitioner then said to Cenescat, "I'm going to stop you from acting like a whore." (Id. at 313.) Petitioner took a metal bar, approximately four to five feet in length, out of his vehicle and used it to hit Pierre-Louis twice in the head. (Id. at 313-15; Gay: Tr. at 241-44.) Hercules testified that Pierre-Louis was empty-handed at the time he was struck. (Hercules: Tr. at 321.)

Gay testified that when Pierre-Louis did not return from taking out the trash, she became worried. (Gay: Tr. at 236-37.) She went to her living room window, and saw a man beating her brother, Pierre-Louis, with a long black pipe. (Id. at 236-43.) Gay saw Pierre-Louis crouch to the ground with his left knee down, while holding his hands over his face to protect himself. (Gay: Tr. at 241-42, 244.) She screamed and awoke her mother, who told her to call Eveillard. (Id. at 246.) Gay called Eveillard and the police. (Id. at 247.)

Hercules testified that after petitioner struck Pierre-Louis, Cenescat ran, and petitioner ran after her while still holding the metal bar. (Id. at 314-16.) Petitioner and Cenescat returned to the area after ten to twelve minutes; when he returned, petitioner no longer had the metal bar in his hands. (Id. at 316-17.) Petitioner tried to get into his car, and Hercules prevented him from doing so. (Id. at 317-19.)

A tape recording of two anonymous 911 calls received on July 20, 1999, from the location of East 34th Street and Linden Boulevard, was also admitted into evidence and played for the jury. (Tr. at 418-420.) Although the trial transcript does not contain the text of the recordings, the People's brief in opposition to petitioner's direct appeal provides a summary of the calls. (Docket no. 4, Ex. B, Respondent's Brief at 6-7.) The first call was received at approximately 1:21 a.m. from an unidentified male who stated that someone had just hit a man with a bat and had then run after his girlfriend. (Id.) The second call, received approximately one minute later, was from an unidentified male who stated that: "Someone is dying, someone is bleeding outside. He hit the guy with the baseball bat. I was at the window and I saw it." (Id.) The second caller also stated "it's something like a pipe." (Id.)

At approximately 1:30 a.m., New York City Police Department ("NYPD") Officer **John Chell**[3] ("Chell") and Sergeant John Walcott, responding to a radio call, arrived in an unmarked police car at East 34th Street, between Linden Boulevard and Church Avenue. (Chell: Tr. at 175, 178-79, 201-02; Hercules: Tr. at 348.) Officer Chell observed Pierre-Louis crouched in a "catcher's position" on the sidewalk. (Chell: Tr. at 180, 205-

---

[3] Officer Chell has since been promoted to the rank of Sergeant, and was addressed as such during petitioner's trial. (Chell: Tr. at 175.)

-5-

06.)  Officer Chell attempted to speak to Pierre-Louis, but Pierre-Louis did not respond.  (Id. at 181, 206.)  Approximately one minute later, police officers **Edward J. Mengani** ("Officer Mengani") and James Dahl arrived at the same location.  (Mengani: Tr. at 49-50, 84; Chell: Tr. at 193.)  An ambulance arrived immediately after Officer Mengani, and emergency workers helped Pierre-Louis into the ambulance.  (Mengani: Tr. at 52-53, 101-102; Gay: Tr. at 247.)

Officer Chell spoke to the crowd that had formed, and they pointed to petitioner.  (Chell: Tr. at 181-82.)  Officer Chell looked towards petitioner, who stated, "Yeah, I hit him." (Id. at 182.)  Officer Chell told petitioner to turn around and put his hands behind his back, and thereafter placed petitioner in handcuffs.  (Id. at 192-93.)  Officer Mengani placed petitioner under arrest (id. at 193), searched him, and placed him inside a police car (Mengani: Tr. at 92-93).

Frantz Eveillard testified that after receiving the call from Gay, he ran from his house, which was approximately five blocks away, to 212 East 34th Street.  (Eveillard: Tr. at 28-29; Gay: Tr. at 247.)  Eveillard found Pierre-Louis lying down inside the ambulance.  (Eveillard: Tr. at 29.)  Eveillard tried speaking to Pierre-Louis, but Pierre-Louis did not respond.  (Id. at 30.)  Eveillard then exited the ambulance and spoke to the police.  (Id. at 31.)  Eveillard saw a woman whom he later learned to be petitioner's wife, Nadine Cenescat, panicking in

the street.  (<u>Id.</u> at 32-34.)  Eveillard accompanied Pierre-Louis in the ambulance to Brookdale Hospital, where Pierre-Louis was examined by neurosurgeon **Dr. Roxanne Todor**.  (Eveillard: Tr. at 34; Todor: Tr. at 390-91.)

### 2.  Medical Testimony

Dr. Todor testified that when she first observed Pierre-Louis in the emergency room at Brookdale Hospital, Pierre-Louis was "in a coma, on a ventilator and only minimally responsive." (Todor: Tr. at 391.)  Upon examining Pierre-Louis, Dr. Todor determined that Pierre-Louis had a minimal amount of swelling around his left eye, his left pupil was larger than his right pupil, and he was only minimally responsive to painful stimulus.  (<u>Id.</u> at 391-92.)  Dr. Todor also performed a CT scan of Pierre-Louis's skull, from which she determined that he suffered from an approximately ten-inch "major fracture, compound, which was the coronal suture, which is the fusion part of the front and back parts of [the] skull." (<u>Id.</u> at 393-95.) The fracture "ran the length of the whole suture."  (<u>Id.</u> at 394-95.)  Dr. Todor determined that Pierre-Louis also suffered from multiple fractures to the left side of his skull, in a manner resembling a "windshield that has been shattered."  (<u>Id.</u> at 395.) Pierre-Louis also had a contusion on the left side of his brain. (<u>Id.</u> at 398.)  Dr. Todor performed surgery on Pierre-Louis to remove the frontal temporal portion of the bone on the left side

-7-

of his head to alleviate swelling of the brain, and to repair the temporal lobe that had ruptured. (<u>Id.</u> at 396-97.)

According to the emergency report, Pierre-Louis suffered a grand mal seizure after his arrival at the hospital. (<u>Id.</u> at 406, 411.) Dr. Todor ruled out the possibility that this seizure would have caused a fracture to the coronal suture, and instead testified that she believed that the fracture caused Pierre-Louis to experience a seizure. (<u>Id.</u> at 412.)

Dr. Todor testified that Pierre-Louis died on July 25, 1999 from head injuries. (Todor: Tr. at 397-98.) She determined that Pierre-Louis's head injuries were caused by a minimum of two impacts to his head involving the use of "extreme force." (<u>Id.</u> at 398-99.) Dr. Todor testified that Pierre-Louis's head injuries could have been caused by a bar or pipe approximately three to five feet in length, and that a punch to the head could not have caused such injuries. (<u>Id.</u> at 400-01.) Moreover, while Dr. Todor testified that striking the head on pavement or sidewalk could result in a skull fracture, she stated that it would be "extremely, extremely unlikely" that Pierre-Louis's head injuries were caused by striking his head on pavement or the sidewalk, given the location and extent of the fracture. (<u>Id.</u> at 407-09, 413.) Dr. Todor also ruled out the possibility that Pierre-Louis's head injuries could have been caused by a set of keys hitting him on the head because the "keys alone would not be hard enough to cause the type of injury, and . . . with a key

injury, there is usually laceration or tearing of the skin associated with keys hitting the forehead or the top of the head." (Tr. 401-02.)  Dr. Todor testified that Pierre-Louis did not have any lacerations on the face or scalp.  (<u>Id.</u> at 402.)


### 3. Police Interview of Petitioner

Officer Mengani drove petitioner to the 67th Precinct after his arrest and, upon arrival at approximately 2:00 a.m., took petitioner's photograph and obtained his pedigree information.  (Mengani: Tr. at 55-56, 82, 95, 98.)  Petitioner told Officer Mengani that he lived at 474 Brooklyn Avenue, in Kings County, was thirty-four years old, five feet ten inches in height, weighed 145 pounds and was originally from Haiti.  (<u>Id.</u> at 82-83, 96-97.)

At some point following his arrival at the police precinct, petitioner complained to Officer Mengani of pain to the right side of his head.  (<u>Id.</u> at 71, 98-99.)  Officer Mengani testified that he offered petitioner medical assistance, but petitioner refused to go to the hospital.  (<u>Id.</u> at 72, 102, 120.)  Officer Mengani stated that he did not tell petitioner that his court appearance would be delayed if he went to the hospital (<u>id.</u> at 103), and that he did not see any cuts or bruises on petitioner (<u>id.</u> at 72, 120).

At about 7:00 a.m., Officer Mengani and Detective **Ronald Taylor** ("Detective Taylor") conducted an interview of

-9-

petitioner. (Mengani: Tr. at 104; Taylor: Tr. at 139.) Officer Mengani testified that he advised petitioner of his <u>Miranda</u> rights in English in the presence of Detective Taylor, and that petitioner signed a <u>Miranda</u> waiver and agreed to speak with the police officers. (<u>Id.</u> at 65-71.) Although petitioner spoke English with an accent (<u>id.</u> at 97), petitioner responded to the officers' questions in English, and did not request an interpreter at any time during the interview (Taylor: Tr. at 147). Both officers stated that they understood the petitioner throughout the interview. (<u>Id.</u> at 136-37, 148; Mengani: Tr. at 67.) Officer Mengani and Detective Taylor explained to petitioner that Pierre-Louis was suffering from serious injuries and that petitioner could be facing a murder charge. (<u>Id.</u> at 113-14.)

According to Detective Taylor's testimony, petitioner stated in his interview that while driving on East 34th Street and Church Avenue, he saw his wife, Nadine Cenescat, sitting in her vehicle with Pierre-Louis. (Taylor: Tr. at 135.) Cenescat let Pierre-Louis out of the vehicle and attempted to drive away when she saw petitioner. (<u>Id.</u>) Petitioner then used his vehicle to block and prevent Cenescat from leaving, causing a "slight accident," and Cenescat attempted to exit her vehicle and flee. (<u>Id.</u> at 135-36.) Petitioner stated that when Cenescat exited her vehicle, petitioner also exited his vehicle and was immediately confronted by Pierre-Louis, who then allegedly punched petitioner

-10-

in his face.  (Id. at 136, 148-49; Mengani: Tr. at 112-13.)
Detective Taylor testified that petitioner claimed that he then
punched Pierre-Louis in the face with his keys.  (Taylor: Tr. at
136, 149, 157-58; see also Mengani: Tr. at 117, 128.)  Although
Detective Taylor was not certain whether petitioner stated that
Pierre-Louis was knocked or fell onto the sidewalk during the
altercation, Detective Taylor testified that it was possible that
petitioner had so stated.  (Taylor: Tr. at 149-150.)

The interview of petitioner lasted approximately 20 to
25 minutes.  (Id. at 142-43.)  Approximately 10 minutes after the
interview, Detective Taylor memorialized his recollections of the
interview in writing.[4]  (Taylor: Tr. at 142-44; see also Mengani:
Tr. at 71, 124.)


**B.   The Petitioner's Case**

**Pierre Jean Widmarc**, **Luc Octavien**, **Jean Chery** and **Breus
Eloge** testified as character witnesses on behalf of petitioner,
stating that they knew petitioner to have a good reputation
within the community.  (Widmarc: Tr. at 426-29; Octavien: Tr. at
437; Chery: Tr. at 445, 449-50; Eloge: Tr. at 460, 462.)

---

[4]  Although Detective Taylor's notes of his interview with
petitioner were not admitted into evidence, they were used by
Detective Taylor and Officer Mengani to refresh their
recollections of the interview.  Specifically, Officer Mengani
used Detective Taylor's notes to refresh his memory on cross-
examination and re-direct (Tr: 112, 116), and Detective Taylor
used his notes to refresh his memory during his direct
examination (Tr: 136).

Widmarc, who knew petitioner from church and socialized with petitioner regularly, testified that petitioner had a reputation for peacefulness. (Widmarc: Tr. at 430-33.) Octavien testified that he considered petitioner to be his friend and that he cared about the outcome of the case. (Octavien: Tr. at 438-40.) Chery knew petitioner through their church, and stated that he only spoke to petitioner regarding church matters but knew petitioner to have a reputation for peaceful, law abiding behavior. (Chery: Tr. at 445, 447.) Eloge stated that he only associated with petitioner at work but also knew petitioner to have a reputation for peaceful, law abiding behavior. (Eloge: Tr. at 461-62.)

Petitioner also testified on his own behalf, through a Creole interpreter. (Louis: Tr. at 463.) Petitioner testified that in July 1999, he was employed as a manager for Domino's Pizza, was in charge of approximately 14 employees, and participated in weekly meetings with other Domino's Pizza managers. (Id. at 464-65, 495, 499.) Petitioner had seen Pierre-Louis at one such meeting, but claimed that he had never seen Pierre-Louis and Nadine Cenescat together. (Id. at 502-04.)

Petitioner testified that on July 19, 1999, he worked from 5:00 p.m. until 1:00 a.m. on July 20, at the Domino's Pizza located at 1109 McDonald Avenue. (Id. at 466-67.) At some time between 9:30 p.m. and 10:00 p.m., Cenescat called petitioner and stated that she would pick up their children from the babysitter after work and buy milk. (Id. at 509-10.) Petitioner left work

-12-

in a black Isuzu Trooper, while still wearing his Domino's Pizza uniform. (Id. at 468-69, 478.) Petitioner stated that while driving he saw a grey Toyota Camry that resembled the one belonging to his wife. (Id. at 471.) Although he did not see who was in the car, petitioner followed the Camry, because he thought that his wife was going to buy milk after picking up their children, and petitioner did not want to leave the children unattended in the car while Cenescat was at the store. (Id. at 471-73, 511-514.)

Petitioner testified that as he turned onto East 34th Street, he saw the Toyota Camry double-parked. Pierre-Louis was exiting from the passenger side of the vehicle, heading towards the sidewalk, and Cenescat was exiting the car as well. (Id. at 473-75.) Petitioner testified that while attempting to slow his car and roll down the window to speak with his wife, his foot skipped from the clutch pedal, causing his vehicle to collide with his wife's car. (Id. at 475, 518-19, 524-25.) Petitioner claimed that he looked into the Camry, saw that his children were not inside, and exited his car and walked to the sidewalk where his wife was standing with Pierre-Louis. (Id. at 476.) He asked his wife "Where are the kids," "Where are the meals you're supposed to buy?" and "Where [did] you come from with that man?" (Id. at 476-77.) Petitioner stated that he was not angry when his wife did not respond to these questions. (Id. at 524.)

-13-

Petitioner claimed that Pierre-Louis said to him, "I am
the boyfriend of your mother," and that when petitioner told
Pierre-Louis not to interrupt his conversation with his wife,
Pierre-Louis cursed petitioner's mother. (<u>Id.</u> at 477.)
Petitioner told Pierre-Louis not to disrespect his mother, and
said "Open you [sic] big mouth. I'm going to have you eat your
own teeth, swallow your own teeth." (<u>Id.</u> at 477-78.)
Petitioner claimed that at that point, Pierre-Louis hit him on
the right side of his head with his left hand and grabbed
petitioner by his shirt. (<u>Id.</u> at 478, 483, 528, 530.)
Petitioner claimed that he saw something hidden under Pierre-
Louis's shirt, and that Pierre-Louis was reaching for it. (<u>Id.</u>
at 478, 533-34.) Petitioner thought that Pierre-Louis was
reaching for a knife or a gun, but never actually saw a weapon.
(<u>Id.</u> at 533-34.) Petitioner claimed that he feared for his life,
and so he punched Pierre-Louis in the head with his right hand
and pushed Pierre-Louis. (<u>Id.</u> at 478-79, 483, 532-33.) Pierre-
Louis fell and hit his head on the ground while attempting to
evade petitioner's punch. (<u>Id.</u> at 479, 484, 539-41.) Pierre-
Louis held onto petitioner and tried to get up, and petitioner
again pushed Pierre-Louis, who hit his head on the ground a
second time. (<u>Id.</u> at 479, 484, 537-38, 541.) Petitioner went
over to his wife's car, and Pierre-Louis stood up, then crouched
back down. (<u>Id.</u> at 479-80, 543.) Petitioner denied ever hitting
Pierre-Louis with a pipe or umbrella and claimed that he was

acting in self-defense. (<u>Id.</u> at 480, 543.) He stated that he was holding his car keys in his closed fist when he punched Pierre-Louis. (<u>Id.</u> at 481-82.)

Before petitioner could see if Pierre-Louis was injured, the police arrived on the scene, arrested him, took his keys, and took him to the police precinct without questioning him. (<u>Id.</u> at 480-81.) At the police precinct, petitioner stated that he was questioned in English and was not provided with an interpreter even after he requested one. (<u>Id.</u> at 486.) Petitioner testified that he told the police officers that he had been struck, and that his head was hurting. (<u>Id.</u> at 485, 487.) The police told him he would have to wait two or three days to see a judge if he went to the hospital. (<u>Id.</u> at 486.) Petitioner testified that in the morning, at about 7 a.m., another police officer came to speak with him, in English, without an interpreter. (<u>Id.</u> at 487.) Petitioner stated that he "could not understand all the words" spoken to him. (<u>Id.</u> at 488.)

## C. <u>Procedural History</u>

### 1. **Petitioner's Direct Appeal**

On December 18, 2000, a jury convicted petitioner of Manslaughter in the First Degree, in violation of N.Y. Penal Law § 125.20(1). On January 8, 2001, the court sentenced petitioner to a term of imprisonment of fifteen years. (<u>See</u> docket no. 3,

-15-

Affidavit of Tziyonah M. Langsam in Opp'n to Pet. for a Writ of
Habeas Corpus ("Langsam Aff."), ¶¶ 7-8.)

On or about November 26, 2002, petitioner appealed his
conviction to the New York Supreme Court, Appellate Division,
Second Department (see id., ¶ 9), raising the following claims:
(1) petitioner was denied a fair trial by the prosecutor's
misconduct on cross-examination and summation; and (2) his
sentence of fifteen years was excessive. (See docket no. 2, Ex.
A, Brief for Defendant-Appellant dated November 2002 ("Pet. App.
Br.").)

The Appellate Division denied the appeal, holding that
"[t]he defendant's contentions that the prosecutor engaged in
prejudicial conduct in cross-examining him and on summation are
largely unpreserved for appellate review . . . ." People v.
Louis, 759 N.Y.S.2d 693, 694 (2d Dep't 2003) (citations omitted).
The Appellate Division also held that "[i]n any event, the
allegedly improper conduct did not result in reversible error"
and that the fifteen year sentence imposed was not excessive.
Id.

Petitioner then applied for permission to appeal to the
New York Court of Appeals, raising the same issues that were
raised in his direct appeal. On July 29, 2003, the Court of
Appeals denied the application. People v. Louis, 796 N.E.2d 486
(N.Y. 2003).

### 2. Petitioner's § 440.10 Motion

On August 12, 2003, petitioner moved *pro se* to vacate the state trial court's judgment, dismiss the indictment, and modify his sentence, pursuant to New York Criminal Procedure Law §§ 440.10 (motion to vacate judgment) and 440.20 (motion to set aside sentence). Petitioner moved to vacate his conviction on the basis that (1) the indictment against petitioner was defective because Marie Gay falsely represented to the grand jury that the weapon used to kill Pierre-Louis had been recovered and identified, and the prosecutor failed to correct the record; and (2) his trial counsel was ineffective for failing to cross-examine Marie Gay regarding her alleged grand jury testimony about the recovery of a murder weapon.[5] (See docket no. 1, Attachment 9, Memorandum of Law in Support of Motion to Dismiss, Vacate Conviction, Or Modification of Sentence ("Def. 440.10 MOL").) On October 15, 2003, the trial court denied petitioner's motion, ruling that petitioner's claims were procedurally barred and without merit. (See docket no. 2, Attachment 6, Order of Justice D'Emic dated 10/15/03 ("§ 440.10 Order").) The trial court found that petitioner's claims were procedurally barred due to "his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him," N.Y. Crim. Proc. Law §

---

[5] As set forth in section II(C)(2), *infra*, petitioner is mistaken in his assertion that Marie Gay testified before the grand jury about the recovery of a murder weapon.

440.10(2)(c), and also because "the ground or issue raised upon
the motion was previously determined on the merits upon an appeal
from the judgment," N.Y. Crim. Proc. Law § 440.10(2)(a).  The
court continued: "In any event [petitioner's] claims are without
merit since he is mistaken in his belief that there was any
testimony made to the grand jury by the victim's sister regarding
the recovery of a weapon."  (§ 440.10 Order at 2.)  Finally, the
court also found that petitioner lacked any basis for setting
aside his sentence because there was no showing that it was
"unauthorized, illegally imposed or otherwise invalid as a matter
of law," N.Y. Crim. Proc. Law § 440.20(1).  Petitioner applied
for leave to appeal the trial court's decision regarding his
motion to vacate, but the Appellate Division denied the
application on February 27, 2004.  (Langsam Aff. ¶ 14.)


    3.   **Habeas Petition**

        On July 7, 2004, petitioner filed the instant petition
for habeas corpus, alleging that: (1) prosecutorial misconduct in
cross-examination and summation deprived petitioner of a fair
trial and due process of law; (2) trial counsel was ineffective
because he failed to cross-examine Marie Gay during trial
regarding the alleged recovery of "a piece of pipe" and to seek
dismissal of the indictment based on Gay's alleged perjury to the
grand jury; (3) the indictment was defective due to the grand
jury's reliance on perjured testimony and on police reports

                              -18-

referring to a "piece of pipe" that was not produced at trial;
and (4) the sentence of fifteen years imprisonment was
unreasonable and excessive.  (<u>See</u> docket no. 1, Petition for Writ
of Habeas Corpus ("Habeas Pet.").)


## II. DISCUSSION

**A.    Review of Habeas Petitions Under AEDPA**

Before addressing each of petitioner's claims, the
Court reviews the relevant law under the Antiterrorism and
Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-
132, 110 Stat. 1214 (1996) as it relates to the timeliness of
petitioner's application for relief and the standard of review
under AEDPA.


**1.    Timeliness**

A petitioner must file an application for a writ of
habeas corpus within one year of when the challenged conviction
becomes final.  <u>See</u> 28 U.S.C. § 2244(d)(1)(A).  A conviction is
considered "final" for the purposes of the limitations period
either when the United States Supreme Court has denied certiorari
or when the petitioner's time to seek direct review in the United
States Supreme Court by writ of certiorari has expired.  <u>Williams
v. Artuz</u>, 237 F.3d 147, 151 (2d Cir. 2000).  Criminal cases must
be brought to the United States Supreme Court for review of a
lower state court judgment within ninety days of an order by the

-19-

state court of last resort denying discretionary review.  Supreme
Court Rule 13(1).

Here, the New York State Court of Appeals denied
petitioner's application for leave to appeal on July 29, 2003.
Petitioner filed his petition for a writ of habeas corpus on July
7, 2004, less than one year and ninety days later, and thus
within the limitations period.


**2.    Standard of Review**

The AEDPA established a deferential standard that
federal courts must apply when reviewing state court convictions.
Under AEDPA, a federal court may grant habeas relief with respect
to a federal claim adjudicated on the merits in state court only
if the adjudication of the claim resulted in a decision that was
either: (1) "contrary to, or involved an unreasonable application
of, clearly established Federal law, as determined by the Supreme
Court of the United States," or (2) "based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding."  28 U.S.C. § 2254(d).  In addition,
"a determination of a factual issue made by a State court shall
be presumed to be correct," and the applicant for habeas relief
has the burden of "rebutting the presumption of correctness by
clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

A state court's decision is "contrary to" clearly
established Supreme Court precedent "if the state court arrives

-20-

at a conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A state court decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. The Supreme Court has emphasized that the reasonableness of the application of the law is to be assessed objectively rather than subjectively. Id. at 409-10. Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

To determine whether AEDPA's deferential standard applies, the court reviewing a habeas petition must first consider whether the state court considered petitioner's claims on the merits. Ryan v. Miller, 303 F.3d 231, 245-46 (2d Cir. 2002). A state court has "adjudicate[d]" a state petitioner's claim on the merits when it "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). The state court's

decision need not "explicitly refer to either the federal claim or to relevant federal case law." Id.

Here, the Appellate Division on direct appeal held that petitioner's prosecutorial misconduct claim was "largely" unpreserved for appellate review, and that "[i]n any event, the prosecutor's allegedly improper conduct did not result in reversible error." Louis, 759 N.Y.S.2d at 694. Because the Appellate Division stated that the claim was "largely," but not completely, unpreserved, and then addressed the merits of the claim, the claim was decided on the merits. See Garcia v. Greiner, 01-CV-2470, 2004 WL 943902, at *3 n.2 (E.D.N.Y. Apr. 28, 2004) (finding that state court ruled "on the merits" when the state court "said that the claim was *largely* (not completely) unpreserved and then went on to discuss the merits of the case") (emphasis in original). The Appellate Division also addressed petitioner's claim of excessive sentence on the merits when it held that "The sentence imposed was not excessive." Louis, 759 N.Y.S.2d at 694. Both the prosecutorial misconduct and excessive sentence claims were thus disposed of on the merits, and may not be disturbed absent a showing that the Appellate Division's judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

With regard to the claims of defective indictment and ineffective assistance of counsel which petitioner first raised in his § 440.10 motion to vacate, the trial court found that these claims were procedurally barred but also ruled that "in any event" the claims were without merit.  Because, as discussed below, the court finds that these claims were not procedurally barred, it will examine the merits of these claims, applying the deferential AEDPA standard of review: whether the trial court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  See Garvey v. Duncan, No. 05-5764-pr, 2007 U.S. App. LEXIS 10972, at *31, *44 (2d Cir. May 9, 2007)(dissenting opinion)(applying deferential AEDPA standard of review in examining merits of petitioner's claim, after concluding that state appellate court incorrectly applied state procedural rule to bar petitioner's claim).

The Court addresses each of petitioner's claims in turn below.

**B.    Ground One: Prosecutorial Misconduct**

Petitioner argues that the prosecutor engaged in misconduct by: (1) misrepresenting petitioner's testimony during

cross-examination and summation; (2) denigrating and distorting

the defense; (3) acting as an unsworn witness and bolstering the

prosecution's witnesses; and (4) making inflammatory and

prejudicial remarks.  (See Pet. App. Br. at 21-32.[6])

     "The Supreme Court has instructed federal courts

reviewing habeas claims brought by state prisoners and premised

upon prosecutorial misconduct in summation to distinguish between

'ordinary trial error of a prosecutor and that sort of egregious

misconduct . . . amount[ing] to a denial of constitutional due

process.'"  Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir.

1990)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647-48

(1974)).  "Under the standard of Donnelly, the question before a

federal appellate court is whether 'the prosecutorial remarks

were so prejudicial that they rendered the trial in question

fundamentally unfair.'"  Id. (quoting Garofolo v. Coomb, 804 F.2d

201, 206 (2d Cir. 1986) and citing Donnelly, 416 U.S. at 645).

See Greer v. Miller, 483 U.S. 756, 765 (1987) ("To constitute a

due process violation . . . prosecutorial misconduct must be of

sufficient significance to result in the denial of the

defendant's right to a fair trial.") (internal quotations and

citations omitted); Darden v. Wainwright, 477 U.S. 168, 181

---

    [6]  Because petitioner's application for writ of habeas
corpus addresses petitioner's prosecutorial misconduct and
excessive sentence claims by reference to petitioner's direct
appeal, the Court addresses the arguments made in petitioner's
brief on his direct appeal.

(1986) ("It is not enough that the prosecutor's remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.") (internal quotations and citations omitted).

In considering whether petitioner suffered actual prejudice, the habeas court should evaluate: (1) the severity of the alleged misconduct, (2) any measures adopted to cure the misconduct, and (3) the certainty of the conviction absent the improper statements.  <u>Floyd</u>, 907 F.2d at 355.  The court should also review statements allegedly constituting prosecutorial misconduct "in the context of the entire argument before the jury to determine whether the defendant was deprived of a fair trial." <u>United States v. Tocco</u>, 135 F.3d 116, 130 (2d Cir. 1998)(citation omitted).  "In particular, where the defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal."  <u>Id.</u> (citations omitted).


1.    **The Prosecutor's Alleged Misrepresentations of Petitioner's Testimony**

     a.    **Alleged misrepresentations regarding petitioner's English-speaking abilities**

Petitioner argues that the prosecutor, during cross-examination of petitioner and on summation, mischaracterized

petitioner's answers regarding his English-speaking abilities. (Pet. App. Br. at 22-24.)

The record shows that on direct examination, testifying with the assistance of a Creole interpreter, petitioner stated that during his interview with Officer Mengani and Detective Taylor, he requested an interpreter but was not provided with one, and that he could not understand everything the police officers said to him. (Louis: Tr. at 487-88). On cross-examination, the prosecutor asked petitioner whether he understood English, and petitioner answered, "I do understand English; not all the words. That's the reason why I asked someone to translate for me, when you tell me something that I don't understand." (<u>Id.</u> at 497.) Petitioner explained that he did not have the opportunity to go to school to learn English, and that his English-speaking tasks at his workplace were limited. (<u>Id.</u> at 497-98.) The prosecutor then asked, "So it's your testimony that you rose up to become a manager . . . and you do not understand English?" (<u>Id.</u> at 498.) Petitioner answered, "I understand English, but not everything." (<u>Id.</u>) After ascertaining that petitioner performed his work-related duties in English, the prosecutor, referring to petitioner's post-arrest interview with Officer Mengani and Detective Taylor, asked: "Isn't it a fact that the only reason that you are now maintaining that you do not speak English is because you know that the statement that you initially gave does not make out a

self-defense claim?  Yes or no." (Id. at 500.)  An objection was raised and overruled, and petitioner again explained that although he spoke English, he did not understand "all the words" and he required an interpreter at trial because he wanted to understand everything that was happening. (Id. at 500-01.)  This line of questioning concluded when the prosecutor asked petitioner whether he spoke with his attorney in English without an interpreter, and an objection was sustained. (Id. at 501.)

Petitioner argues that the prosecutor's questioning on cross-examination "deliberately ignored" petitioner's testimony that he spoke English but did not understand some words, and misrepresented petitioner's testimony by "suggesting that [petitioner] had said he did not understand English, when he had not." (Pet. App. Br. at 23.)  Petitioner also argues that the prosecutor's misconduct was compounded by the prosecutor's comments on summation, during which the prosecutor stated that petitioner was "pretend[ing]" that he did not speak English and was trying to "put one over" on the jury. (Id. at 24; Louis: Tr. at 624-25.)

The record shows that the prosecutor's questions during her cross-examination of petitioner and her arguments on summation were made in response to certain aspects of petitioner's testimony which contradicted the testimony of Officer Mengani and Detective Taylor.  On direct, for example, petitioner stated that he had requested but not been given an

interpreter when he was interviewed by police, and that he did not understand everything the police officers said to him. (<u>Id.</u> at 486, 488.) Petitioner also testified that he accidentally hit his wife's car with his own vehicle. (<u>Id.</u> at 475). These statements contradicted the earlier testimony of Officer Mengani and Detective Taylor that petitioner did not request an interpreter during his post-arrest interview (Mengani: Tr. at 103-104, 114-116; Taylor: Tr. at 147), and that petitioner stated that he intentionally tried to block his wife from driving away, thus causing an accident (Taylor: Tr. at 135-36). Similarly, on cross-examination, petitioner stated that he did not speak to his wife immediately after the incident (<u>id.</u> at 543-44). Detective Taylor, however, testified that petitioner told the officers that he did speak to his wife immediately after the incident (<u>id.</u> at 136, 150, 154).

The Court finds that, when considered in the context of direct and cross-examination of the witnesses, the prosecutor's cross-examination of petitioner and her statements during summation were a fair response to the defense's attempt to highlight petitioner's limited English-language ability and to cast doubt on the testimony of Officer Mengani and Detective Taylor. <u>See</u> <u>Delgado v. Walker</u>, 798 F. Supp. 107, 115-16 (E.D.N.Y. 1992) (finding that state trial court's admission of videotape showing habeas petitioner speaking in English, in order to refute petitioner's claim that he did not speak or understand

English and could not have confessed to police officer, did not deny petitioner of, *inter alia*, right to fair trial). Thus, even if the prosecutor's conduct was improper, which it was not, it did not constitute the type of egregious misconduct amounting to a denial of petitioner's right to a fair trial and due process.

### b. Alleged misrepresentations regarding petitioner's self-defense claim

Petitioner also alleges that during summation, the prosecutor misrepresented petitioner's testimony regarding whether he acted in self-defense. (See Pet. App. Br. at 25.) During trial, petitioner testified that he saw Pierre-Louis put his hand below his shirt, that he thought Pierre-Louis might have a weapon, and that he punched Pierre-Louis in self-defense. (Louis: Tr. at 483, 534.) On cross-examination, the prosecutor questioned petitioner regarding his statements:

> Q: [Pierre-Louis] never pulled out a weapon or anything, did he?
>
> A: He put his hand below his shirt. I don't know what he was going to do. I don't know if he have a knife. I don't know if he have a gun.
>
> Q: Okay. Those are two different things, a knife and a gun. They're completely--they look completely different; would you agree?
>
> A: Yes, I think so.
>
> Q: So could you see what he supposedly had?
>
> A: I don't know what he had.

(<u>Id.</u> at 534.)  On summation the prosecutor stated:

> On direct examination . . . [petitioner]
> tried to make it seem as if the deceased
> pulled up his shirt and he had a weapon; he
> thought it was a weapon.  Then on cross-
> examination:  Well, it could have been a
> knife or a gun.
> Well, hold up.  Those are two different
> things.
> "You didn't really see anything, did
> you?
> "Well, no, I didn't."  He didn't see
> anything.
> Again, it's an attempt to tailor his
> testimony to the law.

(Summation: Tr. at 638).

Again, placed in context, the prosecutor's arguments on summation erroneously quoted petitioner's testimony but were not prejudicial and did not amount to a violation of petitioner's constitutional right to a fair trial.  Instead, the prosecutor's arguments were not prejudicial, but were directed at emphasizing that despite petitioner's testimony that he believed Pierre-Louis may have had a weapon, petitioner did not actually see Pierre-Louis remove a weapon -- neither a knife nor a gun -- from his shirt.  The prosecutor's statements were in accord with the Supreme Court's "longstanding rule that when a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness."  <u>Portuondo v. Agard</u>, 529 U.S. 61, 69 (2000) (internal quotations and citation omitted).  "When [a defendant] assumes the role of a witness, the rules that generally apply to other witnesses -- rules that serve

-30-

the truth-seeking function of the trial -- are generally applicable to him as well." Id. (internal quotations and citations omitted). The prosecutor was entitled to challenge petitioner's assertions that he acted in self-defense. In any case, any alleged misconduct by the prosecution did not amount to a denial of due process.

### 2.   Denigrating and Distorting the Defense

Petitioner argues that the prosecutor "[d]enigrat[ed] and [d]istort[ed] the [d]efense" by "repeatedly suggest[ing] that petitioner had concocted and fabricated his defense" and implying that petitioner's counsel was "complicit in the impropriety." (Pet. App. Br. at 25-26.) Specifically, petitioner claims that the prosecutor suggested that petitioner began to develop a self-defense claim after he was arrested and retained a lawyer, that petitioner came up with a "new story" in order to establish a self-defense claim, that petitioner tailored his testimony to conform to the medical evidence, and that defense counsel's opening statement conflicted with the defense actually presented during the trial. (Id. at 25-26.)

In the People's summation, the prosecutor argued that petitioner's statements at trial contradicted his post-arrest statements to Officers Taylor and Mengani:

> PROSECUTION:  . . .  I submit that since he has been arrested, since he has an attorney –

> DEFENSE COUNSEL: Objection to this argument.
>
> PROSECUTION:  -- since he sat in this courtroom --
>
> THE COURT: Overruled.
>
> PROSECUTION: -- he now understands the law of self-defense; and he now understands that a simple punch does not justify the use of deadly physical force.  So, therefore, I submit, he must come up with a new story.  And I submit that that is just what he tried to do in this courtroom.

(Summation: Tr. at 625-26.)  The prosecutor also argued that petitioner tried to "conform [his testimony] to the medical evidence" (id. at 633), and that the testimony presented by the defense differed from defense counsel's opening arguments (id. at 634).

Viewed, again in context, the prosecutor's statements do not assert, much less imply, that the defense was engaged in any impropriety, as petitioner claims.  Instead, the prosecutor's statements were aimed at casting doubt on petitioner's testimony at trial, particularly petitioner's claims that he acted in self-defense and that the decedent's injuries were caused by falling and hitting his head twice on the ground, rather than through trauma from a blunt instrument.  During her closing arguments, the prosecutor also focused on alleged inconsistencies in petitioner's trial testimony, such as whether petitioner's collision with his wife's car was intentional or accidental (id. at 627, 631).

These statements were fair commentary on the disputed facts in evidence. Indeed, the Supreme Court has held that a prosecutor's comments during summation regarding a petitioner's opportunity to hear other witnesses testify and to tailor his testimony accordingly, do not violate the petitioner's rights under the Fifth, Sixth and Fourteenth Amendments. <u>Agard</u>, 529 U.S. 61, 73 ("Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate . . . to the central function of the trial, which is to discover the truth.") Again, the prosecutor's statements were in accord with the Supreme Court's "longstanding rule that when a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness." <u>Id.</u> at 69 (citation omitted). Moreover, "[b]oth prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments." <u>United States v. Suarez</u>, 588 F.2d 352, 354 (2d Cir. 1978)(citation omitted).

Petitioner also claims that the prosecutor "impugned [petitioner's] right to make objections" by "telling the jury that defense counsel had attempted to keep the jury from hearing the 911 calls" and suggesting that petitioner's right to object to evidence "was merely a technicality that stood in the way of the jury's learning the truth." (Pet. App. Br. at 27.) The record reflects, however, that the prosecutor's comments were

made in response to defense counsel's comments on summation,
which questioned the veracity of the anonymous 911 calls.  On
summation, defense counsel argued:

> We have no idea who any of [the 911 callers] are.
> This means nothing in the context of this case.
> This is not what you convict or don't convict
> someone on, some anonymous 911 transmission.

(Summation: Tr. at 596.)  The prosecutor, on summation,
responded:

> You have 911 calls in this case.  Now,
> [defense counsel] objected to them coming in
> but, guess what, you are the judge of the
> facts, and you get to determine how much
> weight you want to give those 911 tapes.
> Just because he doesn't like it doesn't mean
> that you don't consider it.

(Id. at 612).  Given the context in which these closing arguments
were made, the Court finds that the prosecutor did not prejudice
petitioner by noting that petitioner objected to the 911 calls
being admitted into evidence.  The prosecutor's statements were
in direct response to defense counsel's attack on the probative
weight and credibility of the recorded 911 calls, and merely
reminded the jurors that the recordings were evidence that could
be considered and weighed by the jury.  The petitioner's right to
a fair trial was not prejudiced by the prosecutor's statement on
summation.

## 3. Acting as an Unsworn Witness

Petitioner argues that the prosecutor acted as an "unsworn witness" and impermissibly bolstered the testimony of Marie Gay and Jean Hercules. (Pet. App. Br. at 28-30.) Specifically, petitioner argues that the prosecutor acted as an unsworn witness by stating on summation that Gay's testimony concerning the altercation was consistent with her statements to the police and to the grand jury, and that Hercules' testimony was also consistent with his grand jury testimony. (Id.) The grand jury testimony of Gay was not discussed during her trial testimony; Hercules was cross-examined by defense counsel regarding his grand jury testimony.

The record reflects that the prosecutor's statements were made in response to defense counsel's closing arguments, which referred to the grand jury testimony of Gay and Hercules and questioned the credibility of their trial testimony. In his summation, defense counsel argued that Gay did not actually see her brother being hit with a pipe, questioned why she did not speak with police on the night of the incident, and made statements regarding Gay's grand jury testimony:

> . . . at the moment that [Marie Gay] decides
> to look out the window – unbelievable – at
> that exact moment, [the deceased is] getting
> hit over the head with a pipe. Unbelievable.
>     Well, if that was the case, then why
> didn't she tell this to the police that
> night? She didn't talk to the police that
> night. I submit to you she didn't talk to
> the police that night because she was fast

asleep in the back room when this happened.
She doesn't know what happened.  She didn't
see what happened.  Someone told her what
happened.
        A couple of days later, she surfaces in
the grand jury and tells them this story.

(Id. at 584-85.)

In response to defense counsel's arguments, the
prosecutor countered that Gay had talked to police on the night
of the incident, and that the testimony Gay gave at trial was
consistent with her statements to the grand jury.  The prosecutor
argued:

        Now, let's look at [Marie Gay's]
testimony.
        You heard [defense counsel] ask her; I
asked her; this was not the first time that
she testified.  She testified in the grand
jury in this case and, also, contrary to the
statements of [defense counsel], she told you
she spoke to the police that night. . . .
        She went to the police that night.  She
told them what happened.  She came in the
grand jury and, again, within days of this
incident before her brother passed, told them
what happened.
        Out of all of that testimony in the
grand jury, out of what she told the police,
have you heard anyone claim that she made an
inconsistent statement?
        Ask yourself; she was subjected to
cross-examination; she had given prior
testimony.  Did you hear the veracity of her
statements challenged about coming to the
window?  Did you hear any discrepancy between
what she said in the grand jury and what she
said now? . . .
        You didn't hear any of that because, I
submit, her testimony was as consistent last
week as it was a few days after this
incident, and that lets you know that you can
rely upon her when she came in here and she
told you what this man did.

(<u>Id.</u> at 608-10.)

When viewed in context, it is clear that the prosecution's arguments on summation were made in response to defense counsel's attacks on Gay's credibility. Marie Gay testified on direct examination that she spoke with the police on the night of the incident and that she testified before the grand jury. (<u>Id.</u> at 251.) Although neither the prosecution nor the defense questioned Gay regarding the substance of her grand jury testimony, which was not admitted at trial, both the prosecution and the defense referred to Gay's grand jury testimony in their summation arguments. As noted above, defense counsel argued that Gay was asleep when the incident occurred, that she was later "told" what happened, and that she in turn told this story to the grand jury. (<u>Id.</u> at 585.)

Even though it was improper for the prosecutor to refer to Gay's grand jury testimony, the prosecutor's arguments regarding Gay's grand jury testimony were made in response to defense counsel's argument that Gay had fabricated her grand jury testimony. Moreover, the prosecutor's references to Gay's grand jury testimony did not reveal any of her grand jury testimony, and defense counsel did not object to any of these arguments by the prosecution during summation. Finally, as discussed in subsection II(B)(5), *infra*, the trial court's instructions to the jury included an admonition to "Decide the case solely upon the

competent evidence before you." See Wanton v. Mann, 91 Civ.
4950, 1992 U.S. Dist. LEXIS 8446, *7-11 (finding that
prosecutor's reference in summation to witness's grand jury
testimony, which was not in evidence, was improper but not severe
enough to warrant habeas relief, where defense counsel objected
and trial court instructed jury to disregard any of the
prosecutor's claims that had no basis in the evidence).
Consequently, none of the foregoing statements by the prosecutor
were so prejudicial as to constitute a denial of due process or
render petitioner's trial fundamentally unfair.

     With regard to Hercules, defense counsel argued during
summation that Hercules's trial testimony regarding his location
at the time of the incident was inconsistent with his grand jury
testimony, and questioned whether Hercules could have viewed the
incident from his perspective. (Id. at 589-591.) Specifically,
defense counsel argued that Hercules had testified to the grand
jury that he was sitting in front of his home at 189 East 34th
Street when he observed the incident between petitioner and the
deceased, but at trial Hercules stated that he was located three
houses down from 212 East 34th Street on the opposite side of the
street. Defense counsel noted in summation that he had asked
Hercules on cross-examination, "Now, Mr. Hercules, is the reason
that you changed your testimony, changing where you were when you
made these observations, is that you had some conversation with
the district attorney about . . . How could you possibly see

this . . . from where you claim you were?" (<u>Id.</u> at 590.) On

rebuttal summation, the prosecutor argued that Hercules's

testimony at trial that the incident happened in front of his

house was consistent with his trial testimony and the facts in

evidence and asked the jury, "what did you hear that was

inconsistent?". (<u>Id.</u> at 613-14.)

Again, when viewed in context, the record reflects that

the prosecutor's arguments on summation regarding the consistency

of Hercules' testimony before the grand jury and at trial were

made in response to defense counsel's contentions that Hercules

did not testify consistently.  The prosecutor's reference in her

rebuttal summation to Hercules's grand jury testimony was not

prejudicial and did not violate petitioner's right to a fair

trial.  Moreover, defense counsel did not object to this aspect

of the prosecutor's summation.

Petitioner next argues that the prosecutor bolstered

her witnesses on summation by arguing to the jury that in order

to believe the defense's arguments, "You would have to believe

that Marie Gay, a Jehovah's witness, came into this courtroom and

lied to you," and that "she came in here and she perjured herself

on the stand." (Tr. at 615.)  Although defense counsel did not

move to strike the comment that Gay was a Jehovah's witness, the

court sustained the defendant's objection to the comment.

Moreover, the prosecutor's comments were made in response to

defense counsel's attempts during summation to cast doubt on

Gay's credibility, and were not prejudicial.  See Crawford v.

Keane, No. 00 Civ. 6672, 2001 U.S. Dist. LEXIS 11739, *16-17

(S.D.N.Y. Aug. 14, 2001) (finding that prosecutor's statement to

jury on summation, that to accept defendant's testimony, "you

must also accept that all the witnesses against him are lying,"

was not improper, and in any case did not substantially prejudice

jury and make trial fundamentally unfair).

Petitioner also argues that the prosecutor acted as an

unsworn witness when she suggested that the police did not look

for a weapon because, at the time of the incident, they viewed

the case as an assault, not a homicide.  (Pet. App. Br. at 29.)

On summation, the prosecutor argued:

> Now, defense counsel makes much of the fact:
> Where is this weapon?  Ladies and gentlemen,
> look at what happened here.  The police come
> to the scene.  The deceased isn't bleeding;
> he's crouched.  They don't know he's bleeding
> internally and that he's dying. . .  I submit
> at this time it didn't look like a homicide;
> it looked like an assault case to them.

(Tr. at 618).  The prosecutor's argument countered defense

counsel's arguments during summation, highlighting the

prosecution's failure to produce the weapon allegedly used to

attack the deceased.  (Tr. at 575.)  In this context, the

prosecutor's argument explaining why the weapon may not have been

retrieved was not unduly suggestive or prejudicial.  The

prosecutor's argument suggested a reasonable inference that the

jury could have drawn based on the facts in evidence, namely that

-40-

Pierre-Louis had suffered serious injuries but was not killed on the night of the incident.  Moreover, the court sustained an objection by defense counsel to the prosecutor's statements. (Tr. at 618.)

### 4.    Making Inflammatory and Prejudicial Remarks

Petitioner claims that the prosecutor made "inflammatory comments" by referring during summation to a recent news event concerning a domestic violence counselor who had killed two people.  (See Pet. App. Br. at 30; Tr. at 635-36.) The transcript shows that prosecutor raised the news event after questioning whether petitioner's character witnesses knew him "outside of church or outside of work," that the court sustained an objection, and that the prosecutor did not mention the news event again.  The Court finds that the prosecutor's mention of the news event, which was brief, objected to, and sustained, did not cause any substantial prejudice to petitioner, whose trial counsel did not move to strike the comment.

Petitioner also claims that the prosecutor suggested on summation that petitioner's own wife, who did not testify at trial, believed petitioner to be guilty because she ran away from petitioner and went to the hospital with Pierre-Louis.  (See Pet. App. Br. at 31.)  Specifically, the prosecutor asked the jury, "if [petitioner is] such the wronged party, why is his wife at the hospital with the victim in this case the night of the

incident?  Why is his wife running down the street away from him?" (Tr. at 636.)  These statements were based on testimony by prosecution witnesses that the deceased's wife went to the hospital the night of the incident (Eveillard: Tr. at 35) and that she ran from petitioner (Hercules: Tr. at 314-16).  The Court thus finds that the statements were fair comment on the facts in evidence, and do not constitute egregious misconduct which denied petitioner due process.

### 5.    Curative Instructions and the Strength of the Evidence

In addition to considering the severity of the alleged misconduct, the Court also must consider any measures adopted to cure the misconduct and the certainty of the conviction absent the improper statements.  <u>Floyd</u>, 907 F.2d at 355.  Here, any misconduct was addressed by the trial court's curative instructions to the jury following each side's summations, during which the Court instructed the jury:

> During the course of the trial,
> incidents may have occurred which you were
> instructed to disregard and dismiss from your
> minds and there were times when questions
> were asked as to which objections were made
> and sustained.  Whether these matters were
> trivial or consequential is of no concern
> here, for they are not in the case and you
> must not be influenced by any of them; nor
> shall you draw any inferences with respect to
> any of them.  Decide the case solely upon the
> competent evidence before you and determine
> the issues on what you believe to be the
> credible, believable evidence.

(Tr. at 641.)  The court further instructed the jury that "The arguments[,] remarks and summations of counsel are not in evidence. . . . You must take the evidence from the mouths of the witnesses as you have heard them and from the exhibits which have been received in evidence."  (Tr. at 643.)  These curative instructions properly directed the jury to decide the case based only on the testimony and exhibits in evidence before them, and served to remedy any objectionable statements by counsel on summation.

Any misconduct committed by the prosecutor must be weighed against the overwhelming evidence of petitioner's guilt. See United States v. Elias, 285 F.3d 183, 192 (2d Cir. 2002) (finding no prosecutorial misconduct where "[t]he specific remarks at issue did not touch upon or bolster the most potent of the government's evidence").  The jury heard testimony from two eyewitnesses, Marie Gay and Jean Hercules, both of whom saw petitioner hit Pierre-Louis in the head multiple times with a metal bar or pipe.  Two anonymous 911 calls corroborated the eyewitness accounts.  Petitioner admitted to assaulting Pierre-Louis, and was apprehended at the scene of the incident.  Expert medical testimony was introduced, demonstrating that Pierre-Louis's injuries were consistent with being struck with a bar or pipe, and that it was "extremely, extremely unlikely" that Pierre-Louis could have suffered those injuries in the manner described by petitioner.  (Todor: Tr. at 409.)  The Court is

satisfied that given the weight of the evidence establishing petitioner's guilt, the prosecutor's comments during summation played an insignificant role.

For the reasons stated above, it is respectfully recommended that the Court deny petitioner's claims on ground one, alleged prosecutorial misconduct, because, under AEDPA's deferential standard, none of the state court's decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).


**C.**   **Grounds Two and Three: Defective Indictment and Ineffective Assistance of Counsel**

Petitioner's ineffective assistance of counsel and defective indictment claims are both premised on petitioner's allegation that Marie Gay committed perjury before the grand jury by testifying regarding recovery of a murder weapon.  (See Habeas Pet. at 8-10.)  In his defective indictment claim, petitioner alleges that the indictment against him was defective because Marie Gay falsely testified to the grand jury that the weapon used to kill Pierre-Louis had been recovered and identified.  Id. Petitioner's ineffective assistance of counsel claim alleges that his trial counsel was ineffective because (1) counsel failed to cross-examine Marie Gay at trial regarding her alleged perjury before the grand jury and regarding documents noting recovery of

a weapon by Gay and her brother, and that this failure impaired

petitioner's justification defense, and (2) counsel failed to

seek dismissal of the indictment.  Id.  Respondent argues that

both of these claims are procedurally barred and may not be

reviewed by a federal habeas court.  (See docket no. 3,

Memorandum of Law in Opposition to Petition for a Writ of Habeas

Corpus ("MOL in Opp'n to Petition") at 7-8.)  Although the court

does not agree that the claims are procedurally barred, both

claims are without merit for the reasons discussed below.


### 1.    Exhaustion and Procedural Bar

In the present case, respondent argues that

petitioner's defective indictment and ineffective assistance of

counsel claims are barred because the state court denied them on

the grounds that they were barred under N.Y. Crim Proc. Law §§

440.10(2)(c) and 440.10(2)(a).  The trial court considering

petitioner's § 440.10 motion held that:

> Defendant's claims of perjured testimony
> and ineffective assistance of counsel for
> failing to cross-examine the witness
> regarding that testimony are procedurally
> barred due to " . . . his unjustifiable
> failure to raise such ground or issue upon an
> appeal actually perfected by him" (CPL §
> 440.10[2][c]) and those claims which were
> raised on direct appeal, were reviewed by the
> Appellate Division and affirmed.
> Furthermore, defendant's motion to vacate
> must be denied since "the ground or issue
> raised upon the motion was previously
> determined on the merits upon an appeal from
> the judgment . . ." (CPL 440 § [2][a]) [sic:

> the court appears to have intended to cite
> N.Y. Crim. Proc. Law § 440.10(2)(a)].

§ 440.10 Order at 1-2.

"Under the independent and adequate state grounds doctrine, the Supreme Court 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" Cotto v. Herbert, 331 F.3d 217, 238 (2d Cir. 2003) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). "This rule applies whether the state law ground is substantive or procedural" and "applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30; see also Harris, 489 U.S. at 264 n.10 ("As long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent state ground doctrine "curtails reconsideration of the federal issue on federal habeas").

A procedural default "bar[s] federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" Harris v.

<u>Reed</u>, 489 U.S. 255, 262 (1989)(citations omitted); <u>accord</u> <u>Fama v.</u> <u>Commissioner of Corr. Servs.</u>, 235 F.3d 804, 809 (2d Cir. 2000).

As noted, a state procedural bar forecloses federal habeas review only where it constitutes both an "independent" and "adequate" state law ground for deciding the claim. Here, the trial clearly relied on two "independent" state procedural rules, N.Y. Crim. Proc. Law §§ 440.10(2)(c) and 440.10(2)(a), and not on any rule of federal law in denying petitioner's motion to vacate.

In determining whether the trial court's reliance on §§ 440.10(2)(a) and 440.10(2)(c) was "adequate" to support the judgment, the court must examine if these rules are "'firmly established and regularly followed' by the state in question." <u>Garcia v. Lewis</u>, 188 F.3d 71, 77 (2d Cir. 1999) (quoting <u>Ford v.</u> <u>Georgia</u>, 498 U.S. 411, 423-24 (1991)). Whether application of the procedural rule is "firmly established and regularly followed" must be judged in the context of "the specific circumstances presented in the case, an inquiry that includes an evaluation of the asserted state interest in applying the procedural rule in such circumstances." <u>Cotto</u>, 331 F.3d at 240 (citing <u>Lee v. Kemna</u>, 534 U.S. 362, 386-87 (2002)).

In New York, "it is well-settled . . . that where the record is sufficient to allow appellate review of a claim, the failure to raise that claim on direct appeal precludes subsequent collateral review of that claim." <u>Serrano v. Senkowski</u>, 2004 U.S. Dist. LEXIS 18936, at *35-36 (S.D.N.Y. 2004)(citing New York

state cases). This rule "applies to bar collateral review where the facts underlying an ineffective assistance of counsel claim appear on the record." Id. Accordingly, where an ineffective assistance of counsel claim is record-based, federal habeas courts have found N.Y. Crim. Proc. Law § 440.10(2)(c) to be "firmly established and regularly followed", and thus "adequate". See, e.g., Sweet v. Bennett, 353 F.3d 135, 139-40 (2d Cir. 2003); Alston v. Donnelly, 461 F. Supp. 2d 112, 123-24 (W.D.N.Y. 2006); Powers v. Lord, 462 F. Supp. 2d 371, 378 (W.D.N.Y. 2006); Serrano, 2004 U.S. Dist. LEXIS 18936, at *35-36. "By contrast, where the ineffective assistance of counsel claim is not record-based, federal habeas courts have held that the rule of CPL § 440.10(2)(c) is not 'adequate.'" Serrano, 2004 U.S. Dist. LEXIS 18936, at *36 n.8 (citing Bonilla v. Portuondo, 2004 U.S. Dist. LEXIS 2774, at *30 (S.D.N.Y. Feb. 26, 2004)(Report and Recommendation)(citing New York state case law holding that claims challenging an attorney's failure to call witnesses do not sufficiently appear on the record so as to require dismissal of that claim if raised for the first time on a § 440.10 motion)).

Here, petitioner argues in his petition for writ of habeas corpus that the documents and facts regarding the defective indictment and ineffective assistance of counsel claims on which he based his § 440.10 motion were not in his possession at the time of the direct appeal, and thus the claims were not

record-based. (Habeas Pet. at 9-10.)[7] Similarly, in his memorandum of law in support of his § 440.10 motion, petitioner asserted that although the documents "existed at the time of this trial and appeal . . . these facts were never made a part of the trial record per se, and hence were dehors the record at the time of his appeal." (Def. 440.10 MOL at 2.) Petitioner further asserted that the documents on which he based his defective indictment and ineffective assistance of counsel claims "were secured (from petitioner's trail [sic] attorney) some time during his appeal process," and "therefore could not have been made a part of his appeal." (Id. at 2.)

The documents on which petitioner bases his claims for defective indictment and ineffective assistance of counsel consist of "police reports" and a synopsis sheet prepared by the prosecutor and arresting officers. (Habeas Pet. at 10; see also Exs. A-C to Habeas Pet.) Petitioner concedes that the documents existed at the time of his trial, and the documents were in the possession of his trial attorney because petitioner's trial counsel provided the documents to petitioner "some time during his appeal process." (Def. 440.10 MOL at 2.) The documents were not introduced by either the prosecution or defense in

---

[7] Petitioner asserts that "The facts that involve trial counsel's omissions [were] dehors the trial record and could not have been properly raise [sic] on direct appeal" and "Petitioner was not in possession of documents supporting the [defective indictment] claim until after his direct appeal was filed." (Habeas Pet. at 9-10.)

-49-

petitioner's trial, and hence did not become part of the trial record. Because respondent has not addressed whether petitioner was in possession of these documents at the time of his direct appeal, the court cannot conclude that petitioner's appellate counsel possessed these documents at the time of petitioner's direct appeal and could have raised claims based upon them on petitioner's direct appeal. The court thus finds that in the foregoing circumstances the trial court's ruling on petitioner's § 440.10 motion was not "adequate" to bar federal habeas review of petitioner's claims for defective indictment and ineffective assistance of counsel. See Powers, 462 F. Supp. 2d at 378 (finding § 440.10(2)(c) to be inadequate to bar federal habeas review where petitioner's ineffective assistance of counsel claims regarding "trial counsel's failure to investigate were not based on matters within the trial record but rather focused on counsel's failure to perform certain evidentiary testing that purportedly would have yielded exculpatory results and failure to find witnesses to impeach a key prosecution witness"). Neither does N.Y. Crim. Proc. Law § 440.10(2)(a) provide an adequate state law ground for barring review of petitioner's defective indictment and ineffective assistance of counsel claims in these circumstances, because these claims were not "previously determined on the merits upon an appeal from the judgment . . . ." N.Y. Crim. Proc. Law § 440.10(2)(a). As a result, these

claims are not procedurally barred, and the court will consider
the merits of these claims.

> **2.    The Merits of Petitioner's Defective Indictment and
> Ineffective Assistance of Counsel Claims**

Petitioner's defective indictment and ineffective
assistance of counsel claims are both based on petitioner's
contention that Marie Gay perjured herself before the grand jury
regarding the recovery of a murder weapon.  (<u>See</u> Def. 440.10 MOL
at 3-10, Habeas Pet. at 8-10.)  However, the state trial court,
in considering petitioner's motion to vacate, ruled that:

> [petitioner's] claims are without merit since
> he is mistaken in his belief that there
> was any testimony made to the grand jury by the
> victim's sister regarding the recovery of a
> weapon.  Consequently, [petitioner's] claim
> of ineffective assistance of counsel for
> failing to cross-examine her on the matter
> and his claim that this weakened his
> justification defense, is equally without
> merit.

(§ 440.10 Order at 2.)  This determination by the state court is
a factual determination which is afforded a strong presumption of
correctness, and must be rebutted by petitioner with clear and
convincing evidence.  28 U.S.C. § 2254(e)(1).

Here, petitioner has failed to provide any evidence
that Marie Gay testified before the grand jury regarding recovery
of a weapon.  In support of his defective indictment claim,
petitioner points to "police reports" and a synopsis sheet
prepared by the prosecutor and arresting officers which "claimed

-51-

the victim's sister and brother brought a piece of pipe to the precinct and claimed that the pipe was the murder weapon." (Habeas Pet. at 10, Ex. B-2, C-1.)  The handwritten notes attached as Exhibit B-2 to petitioner's motion to vacate, which respondent states were written by the Assistant District Attorney who initially reviewed the case (see MOL in Opp'n to Petition at 9, n. 2), do refer to recovery of a weapon by the decedent's brother, Jean Gay, and identification of the weapon by Marie Gay "as the object used by [petitioner] during the assault." However, as respondent has noted, the prosecutor did not present either a recovered weapon or the documents noting recovery of a weapon to the grand jury or trial jury, and did not question Marie Gay or any other witness about the recovery of a weapon either before the grand jury or during trial.  (MOL in Opp'n to Petition at 9.)  Thus, petitioner's indictment could not have been procured by any alleged perjury by Marie Gay regarding the recovery of a weapon.

Conceding that "it is true that the grand jury minutes lack any . . . testimony from [Marie Gay]" regarding recovery of a weapon, petitioner nonetheless seeks to support his claims by arguing that a portion of the final page of Gay's grand jury testimony transcript, possibly containing her statements regarding recovery of a pipe, is missing.  (Docket no. 5, Petitioner's Reply in Support of Petition for Habeas Corpus ("Pet. Habeas Reply"), at 3; docket no. 2, Attachment 5, Ex. B-3,

-52-

Excerpt of Grand Jury Transcript.)  Although the final page of
Marie Gay's grand jury testimony, page 29, does contain blank
space at the top of the page, it is clear that this is merely the
result of a photocopying error.  Both the page number, normally
located at the top right hand corner of the page, and the line
numbers, which normally start at the top left side of the page,
are positioned in the middle of the page, establishing that no
testimony is missing is missing from the top of the page.

In any event, it is well settled that claims of
deficiencies in state grand jury proceedings are not cognizable
on federal habeas review.  See Lopez v. Riley, 865 F.2d 30, 32
(2d Cir. 1989) (citing United States v. Mechanik, 475 U.S. 66
(1986)); Perez, 2004 WL 307271, at *3.  As the Supreme Court held
in Mechanik:

> [T]he petit jury's subsequent guilty verdict
> means not only that there was probable cause
> to believe that the defendants were guilty as
> charged, but also that they are in fact
> guilty as charged beyond a reasonable doubt.
> Measured by the petit jury's verdict, then,
> any error in the grand jury proceeding
> connected with the charging decision was
> harmless beyond a reasonable doubt.

475 U.S. at 70.  If there was any defect in the indictment
against petitioner, such defect was harmless beyond a reasonable
doubt.

Similarly, petitioner's claim that his trial counsel
was ineffective for failing to seek dismissal of the indictment
and failing to cross-examine Gay at trial regarding her alleged

-53-

grand jury perjury, is without merit.  Under <u>Strickland v.</u> <u>Washington</u>, 466 U.S. 668, 687-88 (1984), a defendant seeking to reverse a conviction based on a claim of ineffective assistance must demonstrate (1) that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms," and (2) that the alleged ineffectiveness resulted in prejudice.

A court considering a claim of ineffective assistance of counsel "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Id.</u> at 689.  In addition, in order to demonstrate prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.

Here, as discussed above, petitioner has not shown that Marie Gay perjured herself by testifying before the grand jury regarding recovery of a weapon. Thus, petitioner's trial counsel can not have been ineffective for failing to seek dismissal of the indictment against him on this basis or for failure to cross-examine Gay at trial regarding her alleged perjury before the grand jury.  Petitioner's claim that his counsel was ineffective for failing to cross-examine Marie Gay during trial regarding the documents noting recovery of a weapon also is without merit, because "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . .

-54-

. strategic in nature' and generally will not support an ineffective assistance claim." Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002)(quoting United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987)).

In any case, even if trial counsel's decision not to cross-examine Marie Gay at trial regarding the documents noting recovery or a weapon was unreasonable, petitioner suffered no prejudice from this error. As noted above, the evidence against petitioner, including the testimony of two eyewitnesses, 911 recordings and expert testimony, was overwhelming. Petitioner has thus failed to show that he was prejudiced by any allegedly ineffective assistance provided by his counsel.

In his reply brief in support of his habeas petition, petitioner also claims that his trial counsel was ineffective for failing to preserve his right to testify before the grand jury, a claim petitioner previously raised when appealing the denial of his § 440.10 motion. (See Pet. Habeas Reply at 2-3; docket no. 2, Ex. B-1, Affidavit in Support of Permission for Leave to Appeal, at 1) This claim was never properly presented to the state trial court, nor was it included in petitioner's habeas petition. Even if the court were to find that petitioner's cursory mentioning of his right to testify before the grand jury was a sufficient method of raising his claim, however, the claim is without merit because the right to testify before a grand jury is a statutorily created right under state law, not a federal

constitutional guarantee, and failure of trial counsel to secure that right does not, by itself, establish ineffectiveness.  <u>See</u> N.Y. Crim. Proc. Law § 190.50(5); <u>Cates v. Senkowski</u>, 02 Civ. 5957, 2003 WL 1563777, at *2 (S.D.N.Y. Mar. 17, 2003) ("The right to appear before the grand jury is secured by New York State criminal law, and not by the federal Constitution.") (citation omitted); <u>Mirrer v. Smyley</u>, 703 F. Supp. 10, 11-12 (S.D.N.Y. 1989) ("The right to a grand jury is a matter of New York State law and as such is not reviewable on a petition for habeas corpus.") (citation omitted); <u>United States v. Ruiz</u>, 894 F.2d 501, 505 (2d Cir. 1990) ("[I]t is well established that defendants have no [federal] constitutional right to appear before a grand jury.") (citing <u>United States v. Ciambrone</u>, 601 F.2d 616, 622-23 (2d Cir. 1979)).  Accordingly, to the extent that this claim is alleged, it is without merit.

For the foregoing reasons, the court finds that petitioner's claims of defective indictment and ineffective assistance of counsel are without merit.  Accordingly, it is respectfully recommended that these claims be denied.

## D.  <u>Ground Four: Excessive Sentence</u>

Petitioner was sentenced to a prison term of fifteen years.  He argues that this sentence was unreasonable and excessive because the sentencing court did not consider

petitioner's good standing within the community, his employment record, the fact that he was married and provides for his two children, the "weak evidence" against him at trial, or the alleged grand jury perjury by Marie Gay. (Habeas Pet. at 11.)

"No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992). See also Thompson v. Lord, 322 F.Supp. 2d 300, 301 (E.D.N.Y. 2004). The term of imprisonment for a person convicted of First Degree Manslaughter in New York State must be between five and twenty-five years. N.Y. Pen. Law § 70.02(3)(a). Petitioner's sentence falls within that range. Thus, because petitioner's sentence meets both statutory and constitutional prescriptions, the Court has no authority to modify petitioner's sentence. Accordingly, it is respectfully recommended that this claim is without merit and should be denied.

### III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the petition for a writ of habeas corpus be denied. Any objections to this Report and Recommendation must be filed with United States District Court Judge Nicholas G. Garaufis within ten days of the date of its entry. Failure to object within ten days of the date of entry will preclude appellate review by the District Court. See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989). Any requests for extensions of time to file objections should be made to Judge Garaufis. The respondent is ordered to serve a copy of this Report and Recommendation on the petitioner and to file a declaration of service no later than June 27, 2007.

**SO ORDERED.**

Dated: June 25, 2007
      Brooklyn, New York

                                   /s/
                                   KIYO A. MATSUMOTO
                                   United States Magistrate Judge